UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PASSION FOREMAN,                    )
    on behalf of D.F.,          )
                                )
               Plaintiff,       )
                                )
         v.              )    No. 12 C 2345
                                )
MICHAEL J. ASTRUE, Commissioner    )    Magistrate Judge Keys
of Social Security,                )
                                )
               Defendant.       )

**MEMORANDUM OPINION AND ORDER**

This case is before the Court on a motion for summary judgment by Passion Foreman, on behalf of her son D.F., a minor. Pursuant to 42 U.S.C. § 405(g), Plaintiff seeks a reversal of the Commissioner's decision denying Supplemental Security Income ("SSI") to D.F., or alternatively, a remand to the Administrative Law Judge ("ALJ") below.[1]  The parties have consented to the jurisdiction of this Court pursuant to 28 U.S.C. § 636(c).  For the reasons explained below, the motion is granted and the case is remanded to the ALJ for further proceedings.

**I.   Procedural History**

---

[1] Plaintiff filed a subsequent application for benefits on April 24, 2012. Plaintiff's Motion at Exhibit A, page 1.  That application was approved. *Id.* Thus, this appeal is for a closed period of benefits, covering March 11, 2010 to May 1, 2012.

On March 11, 2010[2], Plaintiff submitted a claim for SSI benefits to the Social Security Administration ("SSA"), on behalf of her minor child, alleging a disability onset date of January 27, 2010. Record at 135. In the claim, Plaintiff alleged that D.F., who was born February 3, 2004, has borderline intellectual functioning. R. 135. The SSA denied Plaintiff's claim on May 12, 2010. R. 54. Plaintiff petitioned for reconsideration on May 18, 2010. R. 58. In a decision letter dated July 7, 2010, the SSA upheld the determination that D.F. did not qualify for benefits. *Id.*

On August 6, 2010, Plaintiff filed a written request for a hearing before an ALJ. R. 63. Plaintiff subsequently sought the assistance of counsel. R. 93. The hearing took place before ALJ Allyn Brooks on July 21, 2011. R. 28. The ALJ issued a decision on August 16, 2011, denying benefits. R. 14-24. Plaintiff then sought review from the Appeals Council. R. 1. The Appeals Council "found no reason" to review the ALJ's decision, and consequently denied the requested review. R. 3. This appeal followed.

## II. Factual Background

### A. Kindergarten

---

[2] The record contains some inconsistency as to when Plaintiff submitted the claim to the SSA. For example, both the ALJ's report and the SSA's Disability Determination and Transmittal give the date as March 9, 2010. R. 14, 52-53. However, such a minor discrepancy does not affect the resolution of this case.

In 2009, while attending Alessandro Volta Elementary School in Chicago, D.F.'s kindergarten teacher referred D.F. for a psychological evaluation. R. 199. Cesar Adrianzen, an evaluator working for the Chicago Public Schools, conducted that evaluation on January 25, 2010. Mr. Adrianzen found that D.F.'s cognitive growth was "within the borderline range." R. 200. D.F. could use crayons to color shapes, point to parts of his body, and identify basic shapes and primary colors. R. 199-200. However, D.F. had "significantly low" socialization, below average receptive vocabulary, and "significantly below" average expressive vocabulary. R. 200. D.F. had an "inability to relate to others." R. 200. He only scored a 73 for Full Scale and Permanent IQ, and 77 for Verbal IQ. R. 200. Mr. Adrianzen ultimately concluded that D.F. did "not have the skills necessary to participate in kindergarten." R. 199.

Shortly after the evaluation, on January 27, 2010, D.F. received an Individualized Education Program ("IEP"). R. 226. Each week, the IEP specifically prescribed 350 minutes of special education time to work on language arts, 150 minutes for mathematics, 85 minutes for social/emotional, 85 minutes for independent functioning, 45 minutes for speech/language, and 14 minutes of social work, for a total of 729 minutes per week. R. 248. The special education time ultimately meant that D.F. was

outside of his general classroom for special education services for 42% of the school week. *Id.*

The IEP set out various accommodations and modifications to D.F.'s education in the areas of language arts, math, physical science, social science, independent functioning, speech/language, health, social/emotional, and non-academics. R. 231. As examples of these modified goals, "[D.F.] will respond with one word when spoken to 4/5 days" by April 2010. R. 236. "[D.F.] will identify, point, and write numbers 1-15, he will succeed 3 out of 4 attempts" by November 2010. R. 244. Despite these modified goals, he was still to "be graded using standard classroom criteria in all subject areas." R. 250.

To implement the IEP, D.F. transferred to Kilmer Elementary. R. 225. He began school at Kilmer on February 9, 2010. *Id.* The school assigned Nicole Straube as his special education teacher. See R. 217.

In applying for benefits for D.F., Plaintiff filled out a Function Report on March 11, 2010. R. 145. She indicated that D.F. had no problems with vision and hearing. R. 146. He could be understood "some of the time" both by family and strangers. R. 147. He could participate in conversation with other children and ask for things that he wanted. R. 148. He could not tell a made-up story or deliver simple messages. *Id.* He could count to three, but not to ten. R. 149. He knew his age and most colors

4

and shapes, but did not know his birthday or telephone number. *Id.*

In terms of physical abilities, Plaintiff indicated that D.F. could catch a large ball and copy his first name, but that he could not ride a tricycle, could not print at least some letters, and could not use scissors. R. 150. He could eat with utensils and put his toys away. R. 151. He required help to dress himself and brush his teeth. *Id.* He also had problems with bowel and bladder control. *Id.*

Finally, Plaintiff stated that D.F. only had minimal behavioral impairments. He could share toys and take turns. R. 150. He showed affection towards his parents. *Id.* He could also play pretend and physical games like tag and hide-and-seek. *Id.* However, he could not play board games like checkers or Candyland. *Id.* His attention span was about 30 minutes. R. 151.

D.F. received an IEP report card on April 20, 2010. R. 255. Rachel Temkin, the school social worker, stated that D.F. seemed "much more engaged and happy" in class. R. 255. He had "made nice progress." *Id.* Lauren Agruss, D.F.'s speech pathologist, stated that D.F. was becoming more comfortable in class and was "more willing to use his words to communicate." *Id.* He had likewise made "nice progress." *Id.*

As for academics, Ms. Straube, a special education teacher,
indicated that D.F. was "Making Expected Progress" in goals such
as writing letters, reading aloud, counting to 10, and expressing
his likes and dislikes.  R. 255-256.  He did "a great job"
answering questions, and was growing loud enough so that others
could hear his answers.  R. 256.  However, D.F. was "Not Making
Expected Progress" toward identifying and managing emotions.  R.
256-257.

On May 2, 2010, Ms. Straube completed a teacher
questionnaire regarding D.F.  R. 210-217.  In the domain of
Acquiring and Using Information, Ms. Straube indicated that D.F.
has one slight problem, five obvious problems, and three serious
problems.  R. 211.  She noted that "limited language skills make
academic functioning difficult for [D.F.]."  *Id.*  In the domain
of Attending and Completing Tasks, she noted only one slight
problem, and stated that D.F. "enjoys school and usually has
appropriate attention to tasks."  R. 212.

In the domain of Interacting and Relating to Others, Ms.
Straube indicated that D.F. had four slight problems, two serious
problems, and two very serious problems.  R. 213.  The very
serious problems were "[r]elating experiences and telling
stories" and "[u]sing adequate vocabulary and grammar to express
thoughts/ideas in general, everyday conversation"; these problems
both occurred on an hourly basis (the shortest time-frame option

listed on the form).  *Id.*  She further stated that D.F. had no problems in the domains of Moving About and Manipulating Objects and Caring for Himself.  R. 214-215.  She did not know of any health problems that D.F. had or any medications that he was taking.  R. 216.  Additionally, she commented that D.F. had "recently begun to speak more and seem[ed] to have grown comfortable" in class, but that he was "not functioning academically at an age appropriate level."  R. 217.

The SSA had Dr. Terry Travis review D.F.'s condition on May 11, 2010.[3]  R. 202.  Dr. Travis opined that D.F.'s "[c]ognitive growth was within the borderline range."  R. 201.  Dr. Travis noted that D.F.'s impairment was "severe, but does not meet, medically equal, or functionally equal the listings."  R. 201. In Dr. Travis's opinion, D.F. had a "Less Than Marked" limitation in the domains of Acquiring and Using Information, Interacting and Relating with Others, and Caring for Yourself.  R. 203-204. Dr. Travis found that D.F. had "No Limitation" in Attending and Completing Tasks, Moving About and Manipulating Objects, and Health and Physical Well-Being.  *Id.*  Dr. Travis noted D.F.'s IQ scores and Ms. Straube's findings in her teacher questionnaire. R. 203.

---

[3] Dr. Travis apparently reviewed, at a minimum, Mr. Adrianzen's psychological evaluation and Ms. Straube's questionnaire.  However, he never met with D.F. in person.

After the SSA initially denied Plaintiff's claim, Plaintiff filled out a disability report for the SSA on May 18, 2010 for the appeal.  R. 172.  Plaintiff indicated that D.F.'s condition had not changed and that no new conditions had arisen.  *Id.*  She stated that D.F. could not dress or bathe himself without help, still soiled himself, and did not play with others.  R. 174.

On May 18, 2010, Dr. David Gilliland, a psychologist with the SSA, completed a disability evaluation form.  R. 220.  Dr. Gilliland noted D.F.'s IQ and Ms. Straube's questionnaire.  R. 221-222.  Dr. Gilliland agreed with Dr. Travis' domain assessments.  R. 203-204, 221-222.  Dr. Gilliland likewise determined that D.F.'s borderline intellectual functioning was a severe impairment that nevertheless did not meet or equal the SSA listings.  R. 219.

**B.  First Grade**

The Chicago Public Schools issued to D.F. a new IEP on January 12, 2011.  R. 258-278.  Under this IEP, D.F. no longer needed accommodations, modifications, or special education goals in independent functioning, health, social/emotional, and non-academic.  R. 231, 262.  He no longer impeded his own or others' learning.  R. 232, 263.  D.F.'s special education minutes for language arts dropped from 350 to 240 per week.  R. 248, 274.  Speech/language dropped from 45 to 30 minutes per week.  *Id.*

Nonetheless, D.F.'s time in special education increased. The new IEP greatly increased special education minutes for math, from 150 to 820 minutes per week. R. 274. He was now spending 1,090 minutes per week in special education. R. 274. The new IEP put D.F. outside of his general education classroom for about 63% of the school week. *Id.* The IEP also modified D.F.'s grading in language arts. R. 276. A 'D' will be considered a passing grade for D.F. in this subject. *Id.* For all other subjects, he is to be graded on standard criteria. *Id.* The IEP also notes that D.F. "is not yet reading in first grade. He is not able to write a sentence." *Id.*

On April 1, 2011, D.F. received another IEP Report Card. R. 279. Jashvanti Patel, his special education teacher at the time, indicated that D.F. was "Making Expected Progress" towards all of his goals. R. 279-280. D.F. had learned his numbers up to 40. R. 279. He could count to 100 by rote. *Id.* D.F. was speaking less than he had, and spoke so softly that "[a]t times it becomes difficult to understand him." *Id.* According to speech pathologist Irene Schatz, D.F. could visually identify letters. R. 280. He was always cooperative in class. *Id.* However, Ms. Schatz also noted "some evidence of articulation errors that were not previously reported." *Id.*

### C.   Hearing Before the ALJ

At the July 21, 2011 hearing, Plaintiff testified before the ALJ.  R. 35-50.  She testified that D.F. was routinely pulled out of class for lessons with a special education teacher.  R. 36. He probably does not understand all of his school work even with the special education measures.  R. 38.  Homework that should have, in her opinion, taken D.F. 15 to 20 minutes actually took him an hour with her help.  R. 39.  D.F. had many friends in his special education class and was helpful with household chores. R. 43.  D.F. could write his name and perform the most rudimentary of addition, but he could not do subtraction.  R. 43-45.  D.F. had only recently learned to say the alphabet.  R. 46. He must attend summer school to catch up on his school work.  R. 37.

Plaintiff testified that, although D.F. was seven years old, he still could not tie his shoes and often wets the bed.  R. 41-42.  He had no behavioral problems.  R. 46.  He began stringing words together into simple sentences when he was around 2 or 3 years old.  R. 47.  He had no health problems.  R. 50.

D.F. also testified before the ALJ.  R. 32-34.  However, most of the responses to the ALJ's questioning resulted in "No audible response."  See R. 32-33.  Based on the ALJ's responses, it seems that D.F. had trouble remembering the name of his school, what year of school he was in, and his age.  R. 32-33.

10

No medical expert was present at the hearing.  R. 1.

### D.    The ALJ's Decision

After the July 21, 2011 hearing, the ALJ made the following findings of fact in a decision dated August 16, 2011:  D.F. was born on February 3, 2004, and was therefore classified as a preschooler when the application was filed.  R. 17.  D.F. had "not engaged in substantial gainful activity since" the application was filed.  *Id.*  D.F. has "borderline intellectual functioning," which, while causing more than a "minimal functional limitation," nonetheless does not rise to the level of an impairment for SSA purposes.  *Id.*  The ALJ ultimately concluded that D.F. "does not have an impairment or combination of impairments that meets or medically equals" or that "functionally equals the severity of the listings" of the SSA.  *Id.*

Specifically regarding D.F.'s impairment, the ALJ found that D.F. has a "less than marked limitation in acquiring and using information."  R. 19.  He "has no limitation in attending and completing tasks."  R. 20.  He "has less than marked limitation in interacting and relating with others."  R. 21.  He "has no limitation in moving about and manipulating objects."  R. 22.  He "has less than marked limitation in the ability to care for himself."  R. 23.  Finally, he has "no limitation in health and physical well-being."  R. 24.

11

While the ALJ acknowledged that D.F. has some sort of
learning impairment, his findings indicated that D.F.'s troubles
do not rise to the level of a disability for the purposes of the
Social Security Act. *Id.* This determination was apparently
bolstered by the fact that D.F. was not being treated with
medication or any "other medical modality" and that the special
education classes "seemingly ha[ve] helped" D.F. with his
impairments. R. 18. Thus, the ALJ reckoned that D.F.'s
"impairments are mild enough to be controlled with some
additional attention at school, through special education . . .
and perhaps other nonaggressive forms of treatment." *Id.*

## III. Standard of Review

Under 42 U.S.C. § 405(g), this Court has the authority to
review final determinations made by the SSA. The Court must not
engage in its own analysis of whether Plaintiff is disabled, and
may not "reweigh evidence, resolve conflicts in the record,
decide questions of credibility, or, in general, substitute [its]
own judgment for that of the Commissioner." *Young v. Barnhart*,
362 F.3d 995, 1001 (7th Cir. 2004). Rather, the Court must
review only whether the ALJ applied the correct legal standard
and whether substantial evidence supports the ALJ's
determination. *Schoenfeld v. Apfel*, 237 F.3d 788, 792 (7th Cir.
2001). Substantial evidence means "such relevant evidence as a
reasonable mind might accept as adequate to support a

conclusion." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir.2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir.2008)). Where the Commissioner's decision "lacks 'evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir.2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir.2002)).

A child is disabled within the meaning of the Social Security Act if he has a "physical or mental impairment, which results in marked and severe functional limitations, and which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I).

A child must meet three conditions before he is considered to be disabled. First, he must not be engaged in "substantial gainful activity." 20 CFR 416.924(b). Second, he must have an impairment that is "severe," i.e. causing "more than minimal functional limitation." 20 CFR 416.924(c). Finally, his impairment must meet, medically equal, or functionally equal in severity an impairment listed on the SSA's Listing of

Impairments.  20 CFR 416.924(d).  The parties only dispute this final step.

## IV.  Analysis

Plaintiff contends that the ALJ erred in two principle ways. First, the ALJ's decision was not based on substantial evidence. Pl. Motion at 5.  Second, the ALJ committed legal error by substituting his opinion for that of a qualified medical expert, in violation of Social Security Ruling (SSR) 96-6p.  *Id.*

### A.  The ALJ Failed to Properly Analyze Listing 112.02.

Plaintiff argues that the ALJ erred by not finding that D.F.'s impairments meet, medically equal, or functionally equal SSA Listing 112.02 for Organic Mental Disorders.  Plaintiff alleges that the ALJ's decision was not based on substantial evidence in the record as he did not discuss the special education curriculum that D.F. was participating in or the IEP reports, and, Plaintiff suggests that the ALJ selectively chose from teacher questionnaires to only discuss evidence that supported his findings.  Defendant, however, claims that the ALJ discussed adequate evidence to support his findings and points out that the ALJ is not required to discuss every piece of evidence in his decision.

Social Security Regulation C.F.R. § 416.924 provides that a child's impairment(s) must meet, medically equal or functionally equal a listing in order for the child to be found disabled. 20 C.F.R. 416.924(d). Listing 112.02 states that a child meets the listing for Organic Mental Disorders if he or she shows both:

A. Medically documented persistence of at least one of the following:
 1. Developmental arrest, delay or regression; or
 2. Disorientation to time and place; or
 3. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or
 4. Perceptual or thinking disturbance (e.g., hallucinations, delusions, illusions, or paranoid thinking); or
 5. Disturbance in personality (e.g., apathy, hostility); or
 6. Disturbance in mood (e.g., mania, depression); or
 7. Emotional lability (e.g., sudden crying); or
 8. Impairment of impulse control (e.g., disinhibited social behavior, explosive temper outbursts); or
 9. Impairment of cognitive function, as measured by clinically timely standardized psychological testing; or
 10. Disturbance of concentration, attention, or judgment;
AND
B. 2. For children (age 3 to attainment of age 18), resulting in at least two of the following:
 a. Marked impairment in age-appropriate cognitive/ communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or
 b. Marked impairment in age-appropriate social functioning, documented by history and medical

findings (including consideration of information
   from parents or other individuals who have
knowledge of the child, when such information is
   needed and available) and including, if necessary,
   the results of appropriate standardized tests; or
c. Marked impairment in age-appropriate personal
   functioning, documented by history and medical
   findings (including consideration of information
   from parents or other individuals who have
knowledge of the child, when such information is
   needed and available) and including, if necessary,
   appropriate standardized tests; or
d. Marked difficulties in maintaining concentration,
   persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, Appendix 1.

In order to functionally equal a listed impairment, D.F.'s impairments must result in a "marked" limitation in two, or an "extreme" limitation in one, of the following six domains: acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for oneself, and health and physical well-being. 20 CFR 416.926a(a) & (b)(1).

In the ALJ's decision, he stated that, after considering the evidence of record, including the mother's statements, he found that "the claimant's impairments are mild enough to be controlled with some additional attention at school." R. 18. The ALJ also discussed the six functional equivalence domains, in which he considered evidence from a Functional Report filled out by Plaintiff, the January 2010 psychological evaluation, and select

teacher notes. R. at 19-24. Ultimately, the ALJ found that D.F. is not functionally limited in any of the six domains.

Plaintiff alleges multiple errors that affect the ALJ's findings. First, Plaintiff argues that the ALJ failed to mention the nature and extent of D.F.'s special education. Conversely, Defendant asserts that the ALJ did both recognize and discuss D.F.'s need for special education. Df. Response at p. 6. An ALJ "does not meet the minimal level of articulation required" where he fails to discuss an entire line of evidence. *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. Ill. 1995) (citing *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam)). Here, the only time that the ALJ mentioned special education is to say that D.F.'s mother "has stated that the claimant is not able to progress in school and is in need of special education." R. 18. At no point did the ALJ discuss how long D.F. spent in special education each week or in what areas the special education focused. The ALJ also did not discuss the modifications that D.F. received to his grades and tasks, either in general or as to how such changes compare to the tasks of D.F.'s non-impaired peers, in contravention of 20 CFR § 416.926a(f)(1). Given the vast evidence in the record from D.F.'s special education teachers and therapists, the ALJ's mere mentioning of the mother's opinion that the child is in need of special education does not meet the minimum level of articulation of this line of

evidence required by the ALJ in order to evaluate whether D.F. meets or functionally equals the standards set forth in the C.F.R.

Next, Plaintiff claims that the ALJ erred by not mentioning D.F.'s IEP reports. Defendant, on the other hand, claims that the ALJ was not required to do so. While Defendant is correct that the ALJ need not discuss every piece of evidence, the ALJ is required to "at least minimally discuss a claimant's evidence that contradicts the Commissioner's position." *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. Ill. 2000). In this case, the ALJ never once mentioned the IEP reports, or specifically the 2011 IEP report with its modified grading and increased special education minutes, which show D.F.'s limitations. In rendering his or her decision on a disability, an ALJ must consider all relevant evidence in the case record, which includes opinion evidence from "other sources." SSR 06-03p, 71 Fed.Reg. 45593-03, at *45596. "Other sources" includes "educational personnel, such as school teachers, counselors, early intervention team members, developmental center workers, and day center workers." Id. at *45594. In this case, the IEP reports are relevant evidence and the ALJ should have considered and discussed them in his decision.

Additionally, the ALJ selectively credited certain portions of the 2010 teacher questionnaires, while ignoring others. An

ALJ must "explain why he gave no weight to the portions of the school documents which support a finding that [a claimant] is disabled." *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007). Here, the ALJ relied primarily (and at times, solely) on reports from D.F.'s teacher. For example, in assessing the Attending and Completing Tasks domain, the ALJ cited to the school report to say that D.F. "had slight difficulties with his ability to work without distracting others." R. 20. However, in assessing Interacting and Relating with Others, the ALJ never mentioned the two serious problems or the two very serious problems that D.F.'s teacher indicated. An ALJ's analysis is deficient where he "failed to explain why he did not credit portions of the record that were favorable to [claimant], including the teachers' reports that found [claimant] had serious or obvious problems in this domain." *Hopgood v. Astrue*, 578 F.3d at 700. Therefore, remand is necessary.

Although the ALJ need not discuss every piece of evidence in the record, he may not ignore an entire line of evidence, especially if that evidence is contrary to the ruling. *Robinson v. Astrue*, No. 10 C 5056, 2012 WL 3991625, at *13 (N.D. Ill. Aug. 29, 2012). The Court finds that the ALJ was required to, at the very least, discuss the evidence regarding D.F.'s special education, IEP reports, and the portions of the teacher

questionnaires which show that D.F. has limitations. His failure
to do so here warrants remand for further proceedings.

### B. The ALJ Improperly Relied On His Own Improper Medical Opinion.

Plaintiff argues that the ALJ improperly substituted his own
opinion for that of a medical expert. Pl. Motion at 13.
According to Plaintiff, the ALJ should have elicited an updated
medical opinion from a medical expert, especially to address
D.F.'s 2011 IEP. *Id.* at 13-14. Defendant responds that the ALJ
was not obliged to hear expert medical testimony at the hearing,
because Drs. Travis and Gilliland previously opined on D.F.'s
condition. Df. Response at 13. Defendant asserts that these
opinions are ultimately sufficient. *Id.*

According to SSR 96-6p, an ALJ must obtain an updated
medical opinion when Plaintiff proffers additional medical
evidence that might change the State agency's determination.
Drs. Travis and Gilliland reviewed D.F.'s file in March and July
2010, respectively. However, D.F. received his first grade IEP
in January of 2011. He received an IEP report card in April of
2011. These reports post-date any medical review by over half a
year. The 2011 IEP provides for nearly a 50% increase in the
amount of time that D.F. would spend in special education each
week. The April 2011 report card indicates that D.F. was still

struggling to meet some of his modified goals.  See R. 279-280.
This evidence could modify the ALJ's opinion as to whether D.F.'s
borderline intellectual functioning was severe enough to reach
the level of disability (although it need not).  Therefore,
Plaintiff argues that the 2011 reports should be reviewed by a
medical expert and his or her opinion should be considered by the
ALJ on remand.

In response to Plaintiff's argument that a medical expert
should have reviewed the 2011 documents, Defendant argues that
the record contains an abundance of evidence showing that D.F.
does not meet or equal the Listings.  However, the law requires
that the ALJ "weigh all the evidence and may not ignore evidence
that suggests an opposite conclusion." *Whitney v. Schweiker*, 695
F.2d 784, 788 (7th Cir. 1982).  The 2011 documents potentially
suggest a conclusion contrary to the ALJ's determination.

Moreover, the lawyers for an administrative agency may not
defend the agency's decision on grounds different than those
stated, or at least discernible, in the agency's decision.
*Miljkovic v. Ashcroft*, 376 F.3d 754, 757 (7th Cir. 2004) (citing
*SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943)).  The court must
know what evidence the ALJ actually used in reaching his
decision, not what evidence might corroborate that decision.

Plaintiff argues that in determining that D.F. was not
disabled, the ALJ based his decision at least partly on the fact

that D.F. was not being treated with "medication or other medical modality." R. 18. From this, the ALJ concluded that D.F.'s impairments are mild and controllable with continued special education and "other nonaggressive forms of treatment." *Id.* However, an ALJ may "not make his own independent medical determinations about the claimant." *Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir. 1985) (citing *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982). Here, the ALJ cited to no authority for the proposition that D.F.'s impairments are controllable by means of any medication or medical device, nor does he mentions which medication or device might assist D.F. Neither Dr. Travis nor Dr. Gilliland made any reference to medication or medical modalities. Neither doctor suggested that special education or "other nonaggressive forms or treatment" will adequately control D.F.'s impairments.

In light of the new medical evidence that was not reviewed by a medical expert, and because the ALJ's conclusions are based on his own medical opinion, this case is remanded. On remand, the ALJ is not to substitute his own judgment for that of a medical expert – rather, a medical expert is to review D.F.'s 2011 IEP and April 2011 IEP report card and the ALJ is to consider that medical opinion in coming to his conclusion.

**V.  Conclusion**

For the reasons set forth above, the Court grants Plaintiff's motion for summary judgment. The ALJ's determination is vacated, and this case is remanded to the SSA for further proceedings consistent with this opinion.


Date: April 23, 2013                    E N T E R E D:


                                        --------------------------------
                                        MAGISTRATE JUDGE ARLANDER KEYS
                                        UNITED STATES DISTRICT COURT